# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

### BEDFORD COUNTY.

JANUARY TERM, 1882, No. 110.            MAY 10TH, 1882.

## Horton *versus* The Chevington and Bunn Coal Company.

1. A judgment may be affirmed though portions of the judge's charge are fairly subject to criticism, and in several instances language is used which might well have been omitted or modified.

2. Where plaintiff in ejectment gave in evidence the proceedings of the board of property, showing the rejection of a return of survey for one tract, and a refusal to issue a warrant to him for another, it was not error for the judge to say to the jury that the evidence was competent but not conclusive, at the same time telling them that plaintiff had a right to bring suit within six months and have his claim tried.

3. The mere statement of an allegation that the shifting of the location of a survey, in accordance with the plaintiff's theory, would leave valuable land vacant and subject to be taken up at the price of a few cents per acre, is not error, the statement being true in fact.

4. Nor to say that no mere assumption or guess of a surveyor is sufficient to set aside the legal presumption that a surveyor, in surveying a tract, went upon the land and marked the lines, the remark being harmless if there were no assumptions in the testimony, and appropriate if there were such assumptions.

5. Nor in speaking of a witness to refer to the political offices he has held.

6. Nor to refer to the effect of the comment "of skilful counsel, each the paid advocate of his own side."

7. Nor to say of a surveyor, the location of whose survey was in dispute, that he probably knew more about surveying than some of the witnesses who had ventured opinions, though the remark was uncalled for and inappropriate.

8. Nor to inquire, there being no satisfactory answer to the inquiry, what reason there was for alleging that he (the surveyor) made a mistake about putting a road on his draft, except the mere supposition from the guesses of surveyors looking at it from a partisan standpoint.

9. Nor because, in stating an inferential process which was correct, he neglected to make an additional hypothesis, by means of which full fairness would have been subserved.

10. The theory of the plaintiff was that the Bunn tract adjoined the Lane improvement upon the north. The theory of the defendant was that the Bunn tract adjoined the Bollman improvement upon the south. The official draft of the Bunn tract on its southern line, marked N. 55 E., 509, called for ":John Lane's improvement." The official draft of the Bollman tract, extending the same line of the Bunn tract thirty-seven rods, called on the south for "John Lane." The Court charged the jury in referring to these tracts: "Now you cannot shift the one without shifting the other. If you shift the one and adjoin the Lane, the other would follow, as it is all one straight line." *Held*, not to be error, the context showing that the Court did not mean to say that it was impossible in any circumstances to detach the Bollman from the Bunn, but that its purpose was to answer the argument that the Bunn adjoined the Lane because the Bunn survey called for the Lane.

11. The judge charged the jury: "There is great conflict of testimony with regard to these marks. You can take the blocks and count them. The only one I have counted is the chestnut corner next the Michael Sipes. How persons can differ about the count of that block is to me remarkable. I can count seventy-five growths, and there is nothing to indicate any obscurity of growth or confusion of growth. They can very readily be seen all along the block. It is a block exceedingly plain to count from one end to the other. The surveyors who counted them say that the other chestnut oak blocks on this same line count seventy-five, and they are old and experienced surveyors. On the other hand, you have the others who say that they count but seventy-four. The country down there, according to the evidence, is full of old marks, and it by no means follows as a matter of course that these marks, even if they do count to 1806, were made by Piper in marking an 1806 survey; but there is very decided evidence by some of the oldest and most skilful surveyors that most of these do not count to 1806." *Held*, not to be error.

12. An assignment of error, based upon declarations of the Court concerning oral statements of counsel made in the course of the trial, will not be sustained.

13. An assignment of error in the charge which cuts a sentence into two parts, the second clause correcting the alleged error contained in the first, will not be sustained.

14. The Court charged the jury: "It is by no means sure that roads and streams are not quite as important as trees. They are monuments as much as marked trees. They may be better." *Held*, not to be error.

15. A judgment will not be reversed because a portion of the charge lacked the dispassionate calmness with which judicial utterances should be made and showed want of taste, the substance of that part of the charge being within the testimony.

16. This Court is powerless to afford relief, by the ordinary methods of assignments of error, for grievances arising through the manner of the judge in delivering a charge.


Before SHARSWOOD, C. J., and MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.


Error to the Court of Common Pleas of *Bedford County*.

Ejectment by James A. Horton against The Chevington and Bunn Coal Company.

Upon the trial in the Court below, before HALL, J., the testimony was very voluminous. The plaintiff claimed, under a warrant for ten acres, dated August 28th, 1875, a return of survey for forty-seven acres and fourteen perches, made May 2d, 1877, and an application for two hundred acres of unimproved land, dated April 25th, 1878, with a receipt for the payment of the purchase-money. The board of property

[Horton v. The Chevington and Bunn Coal Company.]

had refused his application for a warrant for the two hundred acres. These papers were given in evidence by the plaintiff.

The defendant claimed, under a survey to William Bunn, for three hundred and ninety-nine and a half acres, made March 4th, 1806, and returned February 27th, 1807. The issue to be determined was as to the location of this survey. The facts sufficiently appear in the opinions of the Courts.

The Court below charged the jury:

"GENTLEMEN OF THE JURY: The case which you have listened to patiently through an entire week is, as you understand, an ejectment, in which the plaintiff, James A. Horton, seeks to recover from the defendants, The Chevington and Bunn Coal Company, the possession of some three or four hundred acres of valuable coal land in Broadtop Township, in this county. The plaintiff's claim is by reason of a warrant for ten acres, dated the 28th of August, 1875, on which he caused a survey to be made on the 2d of May, 1877, for forty-seven acres and fourteen perches, and returned into the land office on the 9th of June, 1877. He did this on the theory that there was a small vacancy between the William Bunn and the John Chevington, as resurveyed. Subsequently he changed his theory, and on the 25th of April, 1878, he applied to the Land Department for a warrant for two hundred acres of land in the same locality, which he alleged to be vacant and unappropriated, belonging to the Commonwealth, and subject to be taken on application and warrant, on the ground that the William Bunn does not lie there at all, but that it lies on and over a high mountain called Ray's Hill. Against the acceptance of this return of survey, on the ten acre warrant, and against the issuing of a warrant on the two hundred acre application, defendants entered caveats, or notices, that they claimed the land. These caveats were tried before the board of property, who, after a hearing, decided in favor of the defendants, that the land was not vacant, but had been long since paid for and appropriated by warrant and survey in the name of William Bunn; and they rejected the return of survey of the ten acre warrant, and refused to issue any warrant on the two hundred acre application, and directed the purchase-money to be returned to Mr. Horton on the two hundred acre application.

"An act of Assembly was passed in 1874 which, it is contended by the defendants, changes the law upon the subject of the Commonwealth's sale of her lands; for the lands of the Commonwealth being generally appropriated, and it being the interest of the Commonwealth that there should be no unprofitable litigation, there should be no encourage-

[Horton *v.* The Chevington and Bunn Coal Company.]

ment to lawsuits, and no encouragement to people who seek out and take lands that are claimed by other people; and, as is alleged, the Commonwealth changed her policy and made the action of the board of property, in refusing the application, the end of it; and a point has been submitted to the Court requesting us to say so to you, and to go farther and say that the Commonwealth's rejection of the return of the Small warrant is also conclusive as to that. This is a new point. It is the first time it has been raised in a court of the Commonwealth, so far as I know; and it has never been before the Supreme Court, so far as I know. We propose to reserve the decision of this point to some future time.

"It will not be necessary to decide it at all if your verdict be for the defendant. If you should find for the plaintiff, we may have to determine that point. [We instruct you, for the purpose of this case, that the decision of the board of property is competent evidence, but that it is not conclusive.—*First Assignment of Error.*] The party losing in that tribunal has a right, within six months, to bring his ejectment, and have his claim tried by a court and jury; and that is what we are here doing now. The plaintiff being dissatisfied with the decision of the board of property, within six months thereafter instituted this suit, because he claims that this land, which has been for many years known and claimed as the William Bunn survey, and which has been repeatedly run and marked on the ground by marks dating back forty-five years, and thirty-eight years, and thirty years, and twenty-seven years, and which has changed hands, has been sold, and conveyed a number of times, as occupying that locality, did not in fact occupy that locality, but a different locality.

"[He would shift it and throw it nearly its entire width over on to other ground, which has been a number of years taken up by other people—covered by other warrants. And they allege that thus shifting it, it would leave this valuable land in dispute vacant and unappropriated, belonging to the Commonwealth, and subject to be taken up, as such, at the price of a few cents per acre.—*Second Assignment.*]

"The burden of proving his case is on the plaintiff, James A. Horton. The law requires all surveys to be made by actually going on the ground, measuring the land, and marking the lines, by the deputy surveyor to whom the warrant is directed, or by his agent; and, after the lapse of twenty-one years from the return of the survey thereon, there arises a presumption of law that the survey was regularly made, on the ground, precisely as returned; and this presumption of law is not rebutted by mere negative evidence that no

[Horton v. The Chevington and Bunn Coal Company.]

marks are found upon the ground where marks might be expected; but still this presumption may be overcome by evidence of marked lines, monuments and other facts, showing that the actual location on the ground was different from the courses and distances as originally returned. [The law requires the surveyor to go upon the ground and mark his survey, and the law presumes that he has done this; and this presumption of law cannot be set aside after the lapse of twenty-one years, except by clear evidence. The evidence to set it aside and to establish another survey than the survey indicated by the official return must be clear, positive and satisfactory. No mere assumption or guess of surveyors will be sufficient to set aside this presumption.— *Third Assignment.*] There must be solid reasons to show the reverse of the original return of survey.

"[A survey of the William Bunn warrant was made by William Piper, a man of prominence in his day, who represented this district in Congress and in the Pennsylvania Senate, and was for several years deputy-surveyor of this county of Bedford. The suppositions, assumptions and guesses, which this case has furnished such an ample manifestation of, as to what Piper did in locating this warrant, and as to the mistakes he made, are utterly insufficient, unless supported by facts, to wipe out this survey as returned; and no theory in relation to the matter can avail unless it is supported by clear evidence, from lines marked in such a way as to satisfactorily demonstrate the location on the ground, shifting the location from that claimed by the defendants and their predecessors in title. Any other rule than this would result in a multitude of lawsuits and utter uncertainty of title.

"A man's opinion as a surveyor is worth nothing except so far as based upon facts actually proved to exist, warranting, sustaining and establishing his opinion as based upon solid ground.—*Fourth Assignment.*] [The duty you have to perform is necessarily very difficult. To test the opinion of the surveyor as to whether it is properly based on the facts; as to whether it is a mere guess, resulting from incapacity to investigate the controversy with knowledge and impartial judgment; or resulting from partisan feeling, or from a mere pride of opinion; and to analyze and weigh properly all the evidence in a confused and complicated case, spread over a week of time, and commented on by skilful counsel, each the paid advocate of his own side, requires a degree of knowledge of the rules of law that govern these matters, and of men and things, which makes your task an exceedingly difficult one.—*Fifth Assignment.*] There has seldom been, perhaps there has never been, in this country, a case

[Horton *v.* The Chevington and Bunn Coal Company.]

involving so large a body of land and of such great value. I have no doubt that you properly appreciate the importance and responsibility of your position, and will endeavor to discharge your duty with impartial fairness.

" [Mere numbers amount to but little. You cannot weigh the case by the number of surveyors that have expressed opinions. The facts, established as true, are to be the basis of your judgment, subject to the rules of law, as you will get them from the Court. The real facts of the case should underlie the opinions, which might be correct, though there was but a single surveyor, whose opinion or theory was on that side, and all the other were against him.—*Sixth Assignment.*] To aid you in determining the real facts of the case and their bearing is the duty of the Court, and so far as we can do so, we will endeavor to aid you.

" [You are to start with the presumption of law that the survey was laid on the ground by the courses and distances exactly as returned into the land office. You dare not presume, nor assume, as some of the surveyors seem to have done, that William Piper either neglected his sworn duty or made mistakes. The probability is, I think, that he knew a vast deal more about surveying than some of those gentlemen who have ventured their opinions.—*Seventh Assignment.*] The defendant's location is in accordance with the certified copy of the return of survey in its courses and distances, allowing for the variation of the needle, and with some small excess of distances, which are very common in old surveys, with the exception of one line, where there is a gain of about twenty rods, which also is not at all an uncommon occurrence in old surveys, arising from what is called the loss of an ' out.'

" The plaintiff's location, as they allege it was made on the ground by Piper, as shown in Mr. Findley's map, shows a a change of degree on one line from south 42 east, to south 75 east. It shows that line made longer by about fifty-three rods, from 219 to 272. It shows also a great shortening on the other line across towards the Lane improvement of some 150 rods. It calls for 515, perhaps, and is shortened, giving the survey an entirely different appearance, as you perceive They say they find marks on the Lane improvement line on the other side or top of Ray's Hill, but quite a long distance away from the defendant's location, which they say count to 1806 ; a chestnut oak near the road, a white oak at a distance of 33 rods, and a hickory at a distance of 70 rods. They say also that they find, on the line over next the Sipes, a chestnut corner and two chestnut oak sight trees, one at the distance of about five rods, and the

other at a distance of fourteen rods from the chestnut corner; and they say that these marks count to 1806, and that these marks induce them to believe that Piper ran this line south 75 east instead of south 42 east; and that when he went to his chamber he found out that he had not land enough to fill the warrant, and abandoned the line south 75 east, and protracted two new lines on paper, one south 42 east, which he extended from 219 to 272 rods, and he extended the other line to meet this; and they assume he did this because of these marks, which they say count to 1806; and they allege these marks thus found were not made by any other person, but that they are the marks of this Bunn survey made by Piper. They allege, and it is also alleged on the other side by the surveyors who testified for the defence, that the line on the north side of this survey was an open line never run by Piper. It was altogether common for a deputy surveyor, in locating a survey, to leave an open line. Indeed, there was, in most cases, a necessity for his doing it. In a warrant, calling for a certain number of acres, as in this case four hundred acres, he could not return more than ten per cent. in excess of that quantity; and, therefore, left an open line on one side or end of his survey, which he would close by calculation or protraction, so as to include the proper quantity. That line, of which he would by calculation ascertain the course and distance, could be afterwards run and marked upon the ground from the marked corner which he had indicated on the ground at one end of it. It is conceded by the defendants' surveyors, as alleged by the other side, that, in this case, Piper left, on one side of the survey, a line calling for the John Bollman, which they say adjoined vacant land as it is now, or as they allege an improvement held by Hubbell. That he left that line an open line and his call is for south 82½ west, 509, leaving that open line for the purpose of closing the survey on it. The defence say he left it an open line, because he ran the Moyer, the Bollman and the Bunn, all that same spring, in March, and it is proved clearly from certified copies that he did return them, and that whatever running was done, was done before; and it is manifest it was done in the spring of 1806. The defendant's surveyors say he simply protracted a line across there because he left that open line between these two surveys and had run the outer line.

"[The plaintiff's surveyors state that he left it to close his survey. Here, then, he had either way a marked line south 75 east, as they say it was marked. And why make an open line in place of it? Why make two open lines in addition to the one he had already left open? These sur-

[Horton *v.* The Chevington and Bunn Coal Company.]

veyors do not undertake to assign any reason for this. When asked the direct question, they fail to give a reason. They say they cannot tell why he did it, nor can they give any reason, or account in any way for the fact that Piper called for a chestnut oak corner at the end of this now supposed plotted line, south 42 east, except that he put down a fictitious call for a chestnut oak corner in violation of what was his duty.—*Eighth Assignment.*] Nor is there anything in the nature of the ground, if you believe the evidence, to warrant such a supposition. The open line on the other side, as they allege it was, was next much more valuable land, if you believe the evidence, and this now supposed open line was on the rough land of Ray's Hill, which is a rocky mountain. But not only does Piper return the survey calling for a chestnut oak at the corner, but for a road at this point, an old road, leading from Sideling Hill to Hopewell Furnace, as crossing near the corner. If this theory of his having made this plotted line is correct, it is difficult to account for this call of the old road being laid down on the return of the survey as it is.

" [No theory has distinctly accounted for this, except the supposition that Piper made a mistake in putting that road down there on the draft. Such a mere supposition or guess can have little weight in the determination of this controversy, and especially in view of the countervailing fact that if indeed he run the line south 75 east, he must have crossed this very road several times and run along it for some distance. How, then, can you suppose, what reason is there for supposing, what reason is there for alleging that he made a mistake about putting this road on his draft, except the mere supposition from the guesses of surveyors, looking at it from a partisan standpoint?—*Ninth Assignment.*] This theory of the location, too, involves the fact that at the other end of the survey, near the line of the Lane, he calls for a post; and the survey thus located interferes to the extent of some fifty rods with an old adjoining survey in the name of John Belt, which is situated there, according to the certified connected draft and the testimony of Mr. Sams, if you believe it, as to the marks he found on the ground in 1854, and also according to the call of the Bollman survey as returned into the land office. For you will notice that Piper returns the Moyer survey, the Bollman survey, and the Bunn survey as all joining each other, as laid down on the certified draft, and on that location of the defendants; and he located the Moyer with its shoulder a little bit stuck between it and the Belt, and when he laid the John Bollman, he called for the Belt. Now if, when he called for the Belt, he called for this survey in dispute, the William Bunn, to be 37 rods

[Horton *v.* The Chevington and Bunn Coal Company.]

away from the Belt at that little line on the Bollman, and, if it is located as the plaintiff locates it, how did it happen that Piper run the Bunn survey some 40 or 50 rods in on the Belt down near the Lane improvement? The law on the subject of the location of surveys is that the lines run and marked on the ground constitute the true survey, and where they are clearly established, as marked for the particular survey, they will control the calls for adjoiners, but when there are no marks found, then these calls for adjoiners will control, and when there are no marks, the calls for adjoiners will overrule the courses and distances; and, if there are no lines marked upon the ground, the survey has to go to its call for adjoiners, even though the distance should embrace a larger number of acres than the return of the survey calls for. It seems to be conceded in the trial and on the argument of this case that this survey, the Bunn, cannot be located adjoining all its calls. It has three calls: first, the Bollman on the north; second, surveyed land on the west; and third, the John Lane improvement on the southeast. It cannot be located adjoining its call for the Bollman and its call for the Lane improvement, without very materially increasing its quantity and changing its shape. The plaintiff claims to adjoin it on the Lane improvement, and throw away its call for the John Bollman; the defendant claims to adjoin it on the Bollman, and throw away its call for the Lane improvement. Both sides claim that the call for surveyed land, which is an indefinite call, is filled by their respective locations. The plaintiff, Horton, claims this call is filled by the Michael Sipes; and the defendant claims it is filled by the John Chevington, which is called a lost survey.

"[In regard to the call for surveyed land, as it strikes my mind, it is a singular circumstance, if Piper knew of the Michael Sipes survey and had intended to join it, as the plaintiff alleges, by a line of the same course, or nearly of the same course, it is a very singular thing that he did not name it as an adjoiner. Why didn't he say adjoining the survey of Michael Sipes, if he had that draft in his hands or knew that it was in there, and could have fitted his survey to it by its course, as the plaintiff claims. But if in fact the big Chevington survey of 1795 was an obscure or uncertain survey by reason of James Piper failing to return it correctly, and he so blundered that the survey has no resemblance to the marks on the ground, that would seem to be good reason why William Piper, in 1806, eleven years afterwards, was not able to tell anything about the location of the John Chevington, and entered the indefinite call of ' sur-

[Horton *v.* The Chevington and Bunn Coal Company.]

veyed land ' at that end of his survey.—*Tenth Assignment.*]
In regard to the other call, and the conflict between the call
for the Bollman and the John Lane improvement, as to which
ought to be regarded as the clearer, more definite, and certain
call, the Bollman is a definite and certain call of a well-located
survey made by William Piper himself, and made the same
year and probably at the same time he located the Bunn.
The John Bollman and the William Bunn warrants were
dated the same day, the 21st of February, 1806, and were both
surveyed in March, 1806, according to the return of survey,
and both were surveyed by Piper.    The applications look as
if they were both, in reality, taken out on the same im-
provement; and, I understand the counsel for the plaintiff,
in his argument, that they were both taken for the same
improvement.    It is altogether probable that John Bollman
and William Bunn lived together in that house.    John
Bollman, on the 1st of August, 1805, applied for 200 acres,
adjoining land of Baltzer Swartz and Francis Mowen on the
east, and the survey of John Belt on the north, and by sur-
veys unknown on the other side—that would be on the
side next the Chevington—on which is an improvement,
consisting of a dwelling-house, barn and nine acres of im-
proved land, first improved May 1st, 1801; and that crops
of wheat and rye were raised thereon, with six persons re-
siding thereon on the 1st day of August, 1805 ; with a sup-
plemental affidavit, made on the 1st day of February, 1806,
that the occupation was still kept up.    William Bunn, on
the 22d day of January, 1806, applied for 400 acres of land,
adjoining Baltzer Swartz and Francis Mowen northerly,
and by Lane's improvement easterly, and on Long's run,
consisting of a dwelling-house, barn, and nine acres of cleared
land, and with these same kind of crops raised.    It would
seem, therefore, exceedingly improbable that Piper did not
know about the John Bollman, which he himself was con-
currently locating and returning.    He located the Bollman,
and he located the Bunn, and he located the Moyer, in the
same spring, and probably at the same time.

" [Besides, the draft of these two tracts, the Bollman and
the Bunn, as returned, shows by their dotted lines, as made
by Piper; it would seem that it shows this conclusively, be-
yond argument or dispute, that he intended to and did
mark the tracts so adjoining each other ; and although he
calls for the Lane improvement on the Bunn, he also calls
for the Lane improvement on the Bollman, on the 37 rod line
of the Bollman.    Now, you cannot shift the one without
shifting the other.    If you shift the one and adjoin the
Lane, the other would follow, as it is all one straight line.—

*Eleventh Assignment.*] Manifestly it is precisely the same, when laying the two tracts together, as if he had connected them on paper. There is no theory of mistake, no explanation, or reason, or argument, assigned to show that Piper did not regard the Bollman and the Bunn as abutting on each other, and that they both joined the Lane improvement.

" [As to the Lane improvement, there is no evidence adduced that Piper ever ran the Lane improvement, as such, until 1809, except it be these three marks that are produced by the defendant. If then the call for the Bollman is the stronger and governing call, the next question is, is it controlled by definite and clearly marked lines on the ground, which will carry the survey away from the Bollman and abut it on the Lane? If you cannot give the survey all its calls, if the call for the Bollman—both surveys being made by Piper, and both calling for the Lane improvement—is the clearer and strongr call, as it seems to me indubitably it is, and you cannot give both calls, and you thus adopt the Bollman, and you regard the indefinite call, the surveyed land on the west, as better filled by the Chevington, under the circumstances of this case, than by the Michael Sipes, and the return of the survey is with the defendants, then there remains the question whether the plaintiff has found marks which must control the return of survey, govern the call, and draw this tract over to the Lane and away from the Bollman.—*Twelfth Assignment.*]

" [The plaintiff alleges that he has six marks counting to the date of this survey, and which he alleges must have been made by Piper in locating this survey. You have heard them repeated over and over; the chestnut oak near the road on Ray's Hill down at the Lane, the hickory and the white oak on that same line, the chestnut corner by the Michael Sipes, and two chestnut oak sight trees down in the same neighborhood. There is great conflict of testimony with regard to these marks. You can take the blocks and count them. The only one I have counted is the chestnut corner next the Michael Sipes. How persons can differ about the count of that block is to me remarkable. I can count 75 growths, and there is nothing to indicate any obscurity of growth or confusion of growth; they can very readily be seen all along the block. It is a block exceedingly plain to count from one end to the other. The surveyors who counted them say that the other chestnut oak blocks on this same line count 75, and they are old and experienced surveyors. On the other hand you have the others who say they count but 74. The country down there, according to

[Horton *v.* The Chevington and Bunn Coal Company.]

the evidence, is full of old marks, and it by no means follows, as a matter of course, that these marks, even if they do count to 1806, were made by Piper in marking an 1806 survey; but there is very decided evidence by some of the oldest and most skilful surveyors that most of these do not count to 1806.—*Thirteenth Assignment.*]

" [You heard the testimony as to the disputed block alleged to have been falsely or mistakenly substituted.  You heard the testimony of the surveyors, as to how that block does count.  You also heard the testimony as to the block which the plaintiff's surveyors allege to count 74, the white oak block from the Lane line ; and of the surveyors, on the part of the defence, saying that it is not an axe-mark, as they think ; that they are not satisfied that it is, and that it don't show the growths from the edge of the axe-mark ; and they insisted on the other side to have it opened, but it has not been opened.—*Fourteenth Assignment.*]  You must consider the evidence with regard to these marks.  It is your duty to do so, and determine in regard to them. On the other hand the plaintiff says he has marks on the chestnut corner located at the proper place, or standing within 18 rods, and corresponding with the shape of the survey, and the other marks ; and also that he has a pine, which Mr. Ketterman swears was a dead pine in 1853 ; that it then looked as if it was dead some years, and which Mr. Sams says counts 42, while other surveyors make it count 26 or 27.  It stands in the right place from the gum, which stands on the Moyer at the proper place and distance, or nearly so ; and they say this block, the chestnut block from the corner, has not been easily accepted, as the witnesses on the other side say the marks do not stand square with the lines as they came to it and went away.  They did not see it, or most of them did not, until the tree was cut, and they reconstructed the block ; and they seek to throw some doubts on this from a little turn, different from the course.  All around the lines, as claimed by the defendant, or on a number of them, are trees that show they have a line of 45 years ; and the surveyors, until these gentlemen made this discovery, were running that survey there on the ground.  This ought to have some weight with other surveyors, for year after year they located it there ; and they there believed it to have been laid properly and adjoining vacant land whereof they knew the true shape.  This you will give what weight you think proper.  You will note that the John Bollman called for an improvement, and the William Bunn called for an improvement dating to 1801.  It seems they were living together, and they made this one improvement to do duty for two, and

[Horton *v.* The Chevington and Bunn Coal Company.]

took out two warrants on the same improvement. It is therefore a significant fact to inquire, Was there any improvement there in 1806? In 1807 William Bunn sold his improvement to Henry Hubbell. There is a mass of testimony in the case, showing that that impovement was known for a great many years as the Hubbell improvement. There is evidence that an apple tree was blocked there and the block counted to 1805, and that there was a considerable amount of cleared land about that improvement.

" [On the other hand, they set up an improvement, which they say sustains their location, but there is no evidence that it goes to 1806, that I have heard; the earliest evidence is about 1835;] then Long, who first saw it at that time, says it was an old-looking building, a story and one-half high, with a door in it, and used by a man named Snow, who was engaged in coaling; and old Mr. Grove goes upon the stand and testifies that he knew that ground well from 1805 to 1822, and that there was no improvement there where they locate this improvement now, in 1822, at the time he left this country. [It is also in evidence that the utmost that is claimed for this improvement of cleared ground is perhaps as much as a quarter of an acre, and some of the witnesses on the other side say there never could have been more than three or four rods square cleared there; that it is stony ground, and it would therefore hardly fill the call for an improvement in 1806, on which both applicants swore nine acres were then cleared.—*Fifteenth Assignment.*]

" [There is also another difficulty of importance. It is by by no means sure that roads and streams are not quite as important as trees. Both sides claim that their location shows a stream. Piper's draft calls for a stream entering from the John Bollman tract to the William Bunn tract eastward from the pine corner and running across the end of the William Bunn tract and passing out near the Chevington coal bank. This is a plainly marked stream on that draft, with a line which connects with the stream on the Bollman draft made by Piper; and, although not accurately laid down the whole length of the stream through the Bollman, the general direction given to it seems to me to indicate quite plainly that it was this large stream, called Sandy run, which runs by the Hubbell improvement, and not the obscure little rivulet which comes down from the spring on the Sipes.—*Sixteenth Assignment.*] You will remember the testimony of the surveyors and others as to the size of the stream; the one is a large and considerable stream, Sandy run, the confluent of Long's run, and the whole is called Long's run, in a general way, from the fact that

old Mr. Long lived on it at its mouth near Hopewell. As to the road, an old road crosses the corner of the survey on Mr. Piper's draft. It crosses, according to the defendant's location, very nearly as it is on Piper's return of survey. On the plaintiff's location it runs along the line Piper must have run, if their theory is correct, the line south 75 east, crossing it twice and entering it once again.

" [There is another feature of the case which you will consider. William Piper, in 1809, surveyed the John Lane improvement; and that survey, as he made it in 1809, interferes, to a large extent, with the location of the William Bunn, as it is located by the plaintiff.] [The theory advanced by the surveyors for the plaintiff and by his counsel is, that Piper made a number of mistakes in running the Lane; and that, therefore, when he came to plot the surroundings, he supposed he was not interfering with the William Bunn as he located it in 1806, as they think; but a singular thing about it, and one utterly unaccountable, is, that if he intended to adjoin the Bunn, if in point of fact he marked the Bunn adjoining the Lane on Ray's Hill, where the Bunn has one long straight line, why would he make three lines? It would have been the quintessence of stupidity to have done such a thing, so far as I can see. Their argument from the supposition that you could change the corner that he put on the ground by a mistake which he made, but was unconscious of, is equally absurd. It is developed by both sides on that draft that he made a certain mistake which he was unconscious of, in running the lines of the Moyer; and this mistake, they say, influenced his mind so that he put the corner near the gum and hickory corner, at a certain place where it would not have been if he had not made this mistake. How could a mistake, of which he was unconscious, influence his mind to put a corner at the place where he would have put it, if he had been conscious of his mistake? It only shows the wonderful facilities surveyors have, when they take sides in a case, to look at everything through glasses that distort.—*Seventeenth Assignment.*]

" Gentlemen, this case is entirely a question of fact with you. The law of the case and the points which the plaintiff has submitted, we have already affirmed. They are that the marks on the ground control the survey, and after them the calls and distances control. This is well-known law. It has always been held in Pennsylvania, and we have already laid that down in this charge, and we affirm it.

" The defendant ask us to say to you that there can be no recovery because of this point with regard to the board of

property. That, we have told you, we refuse. That is, we withhold defendant's first two points relating to the board of property for the present. Then they ask us to say to you that, since the Bollman and the Bunn surveys call for each other by the line north 82½ east, and it is conceded by both parties that there are no marks on the ground for the Bunn on the side next the Bollman, the surveys cannot be separated.

" We have answered this in the general charge. You cannot separate them unless you find marks that clearly compel a separation.

" The next point is: 'In locating a survey, its more certain must be adopted in preference to those less certain and definite calls, if all cannot be adopted.'

" We affirm this.

" The next is: 'If the chestnut corner of the Bunn, as testified to by defendant's surveyors, be established, there is no vacant land which the plaintiff can claim, either by his survey or by his application.'

" That is true if the location of the Bunn, as laid down on the draft made by Mr. Cunard, is correct, as it hangs before you there, and it goes to that chestnut corner; then there is no vacant land there at all. It is all covered by the Bunn.

" 'If the William Bunn interfered to any extent with the John Chevington, and such interference was excluded on a resurvey of the Chevington, the same did not become vacant land, and the plaintiff can obtain no right to locate his survey upon it.'

We affirm this. It is simply this, in other language: That if the William Bunn was on this land that the old Chevington was on, and they took the Chevington off for some reason, it would not leave it vacant land. It would still be held by the Bunn.

" The last point is: 'That the plaintiff having failed to show the legal existence of the defendant, by showing a charter of incorporation, there can be no recovery, and the verdict must be for the defendant.'

" We refuse to affirm this. It is not necessary that they should show the organization of these defendants into a company, so far as this case is concerned.

" Now, gentlemen, we have gone over this case at some length, because of its importance, and of a desire to aid you as far as possible. The law we lay down to you is this: That the plaintiff must make out his case, and the presumption is that the return of survey is correct. [You have no right to assume, nor have surveyors a right to theorize away, or assume, that there were mistakes in it, or that

anything is wrong with it. It must be proved by clear and satisfactory evidence. The preponderance of evidence must be on the part of the man who seeks thus to shift the warrant, and take away from people land which they have bought and paid for, and owned, as they supposed, for many years.—*Eighteenth Assignment.*]

" [As to the marked trees, where is the preponderance of evidence? The chestnut is in dispute, and the pine is disputed; but the weight of the evidence, if you believe Ketterman and Sams, seems to be that the pine is an old marked corner. This chestnut block you can count for yourselves. Excellent surveyors have testified that these three blocks, next the Sipes, count one year too old, and if they are one year too old, that is just as much as if they were ten or fifty years.] [On the other hand, you have trees down next the Lane, the hickory, that a great many witnesses testify to you counts too old. The counsel for the plaintiff, in arguing the case, asserted that there were two marks on it; but nobody said so, that we heard, in the evidence. None of the surveyors said there were two marks on the hickory.—*Nineteenth Assignment.*] If there are, the question for you to determine is what they count to. You have also heard the testimony as to this suspected block, and you have the tree produced here. And you can count the chestnut if you have skill enough, as the surveyors differ as to that block. As to the white oak block in between the hickory and the chestnut oak, the surveyors for the defendant say that this is not an axe-mark. The other side say it is. The defendant concedes that it counts 74 from the mark.

" [As to the road: Roads, streams, and improvements have equal power. They are monuments as much as marked trees; and they may be better. As to the road, where is the weight of evidence? Is it that it is down at that corner where the plaintiff locates the survey? You have no right to assume that Piper made a mistake. The whole weight of the evidence is that he could not, without gross stupidity, have made this mistake; and against a sworn officer there is no such presumption.—*Twentieth Assignment.*]

" As to the stream, which side has the preponderance of the evidence, the little stream or Sandy run?

" As to the improvement, which improvement existed there in 1806, the Hubbell improvement, the improvement on the Bunn as located by the defendant, or the other one? Where is the preponderance of evidence as to that?

" As to the calls, which of these calls were most definite and certain, the Bollman laid down by Piper with dotted lines as being there when Piper did the work, in the spring

of 1806, or the call for the Lane, which there is no evidence that Piper run at all till 1809 ?

" As to the certified draft, it is clear that the courses and distances of the defendant's location are much more nearly the shape of the official return than this of the plaintiff, as laid down in the draft produced by Findley.

" We leave the case with you. It is for you to determine. In discussing the evidence, we do not desire to give you binding instructions, but intend simply to aid you in the investigation of what must be an intricate and difficult case to most of you."

The plaintiff excepted to the charge.

July 29th, 1880, verdict for the defendant ; upon which judgment was afterwards entered.

The plaintiff then took out a writ of error, making twenty assignments of error to the charge, as above in brackets and numbered, and (21) that the charge, as a whole, was onesided, partial, unfair and misled the jury.

*John Cessna*, *John H. Jordan*, and *R. M. Speer* for the plaintiff in error.

1. The board of property are in no sense a court. The Act of April 5th, 1782, provides that the courts of law shall remain open to the parties as fully as if no determination had ever been given : Montgomery v. Snodgrass, 2 Yeates, 230 ; Deal v. McCormick, 3 S. & R., 348. Their decisions are not even *prima facie* evidence of the facts recited in them : Carothers v. Dunning, 3 S. & R., 383 ; Rose v. Klinger, 8 W. & S., 178.

2. The value of the land in dispute had nothing to do with the issue, and the language of the court could only prejudice the jury.

3, 4, and 18. It is difficult to determine what effect the rhetoric of calling William Piper a man of prominence and member of Congress had on the jury : Cauffman v. Long, 1 Norris, 79. It was error to characterize the evidence as assumptions, suppositions, and guesses. Many facts are found by juries upon the opinions of witnesses alone : Batdorff v. The Bank, 11 P. F. Smith, 184 ; Nieman v. Ward, 1 W. & S., 81.

5. The fact that the plaintiff's attorneys were paid for their services, did not appear in the evidence, and had no more to do with the Bunn survey than that the learned judge was also paid for his : Rush v. Cavanaugh, 2 Barr, 189.

6. The fatal vice here lies in setting the opinions of the witnesses in opposition to the real facts of the case. The

real facts are often proved by the opinions of witnesses. No plaintiff could ever get a verdict, if this instruction be sound, in the absence of eye-witnesses, or without material demonstration.

7. The assault by the court upon the testimony might affect every witness. Impartial consideration of the evidence became impossible. The judge had no personal knowledge of the qualifications of Piper, and if he had it would have been unbecoming to institute comparisons between him and the witnesses for the plaintiff: Turner *v.* Commonwealth, 5 Norris, 72; Hocker *v.* Jamison, 2 W & S., 438; Railroad Co *v.* Decker, 1 Norris, 119; Snyder *v.* Wilt, 3 Harris, 59; Bovard *v.* Christy, 2 Harris, 267.

8 and 9. These parts of the charge are like the heated appeals of an advocate. The evidence should be submitted calmly and impartially: Burke *v.* Maxwell, 31 P. F. Smith, 139; Snyder *v.* Snyder, 6 Binney, 499; Deal *v.* McCormick, 3 S & R, 348.

10. There was no evidence that William Piper ever knew or heard of the draft of the survey of Sipes, or knew that a survey of that name was ever made. How could his failure to call it Sipes then be a very singular thing?

11. This instruction presents a false issue: Harsheaur *v.* Hocker, 9 Watts, 455; Bank *v.* Forster, 8 Watts, 304; Canal Co. *v.* Torrey, 9 Casey, 143.

13. The true location of the chestnut corner of the Bunn survey, was the controlling question of the case. Ten witnesses for the plaintiff testified that a chestnut, claimed by him to be the corner, was plainly marked in the direction of the Bunn survey, and counted to the date of 1806. The learned judge, without being sworn, makes a witness of himself, and states to the jury the age of the block as found by his own examination; a judge has no authority to decide a question of fact: Repsher *v.* Wattson, 5 Harris, 368; Heilbruner *v.* Wayte, 1 P. F. Smith, 259; Musselman *v.* Railroad Co., 2 W. N. C., 105.

16 and 20. This instruction as a legal proposition is erroneous. The importance if any to be given to streams depends upon whether they are boundaries: McGowan *v.* Ahl, 3 P. F. Smith, 91.

17. But where is the evidence that the plaintiff's surveyors had "taken sides?" They were sworn as other witnesses; they had no interest in the result; their reputation for truth was not attacked; and they were, at least, as intelligent as the surveyors called by the defendant. Why should they be insulted from the bench and charged with distorting the truth? Their personal wrong is not ours; but, in inflicting

[Horton *v.* The Chevington and Bunn Coal Company.]

it, the Court destroyed them before the jury as credible witnesses.

21. The charge as a whole is studied in its suppression and misrepresentation of facts. The subsequent statement that the Court did not desire to give binding instructions but simply to aid the jury aggravate the injury : Batdorff *v.* Bank, 11 P. F. Smith, 185 ; Insurance Co. *v.* Rosenberger, 3 W. N. C., 16.

*Russell and Longenecker, J. S. Black, J. M. Reynolds* and *Samuel S. Blair,* for defendants in error.

The Court might have taken the case from the jury : Matthers *v.* Hegarty, 1 Wr., 67 ; Malone *v.* Sallada, 12 Wr., 425 ; Eister *v.* Paul, 4 P. F. Smith, 196.

Because he did not take his law from the plaintiff's surveyors he is subjected without opportunity of defence to an unseemly and grossly unjust attack.

OCTOBER 2, 1882.—The decision of the Court was read by GREEN, J.

The assignments of error in this case all relate to the charge of the Court.

There are none to the admission or rejection of testimony or to answers to points.

In the main the complaints are rather to the manner and character of the utterances of the judge in his charge than to erroneous statements of the law. Without doubt, some portions of the charge are fairly subject to criticism, and in several instances, language used might well have been omitted or modified. After a patient examination, however, of the several assignments we have reached the conclusion that none of them are sustained by considerations sufficient to justify a reversal, and the judgment will therefore be affirmed. We will dispose of the assignments in the same order as they are presented in the paper books.

*First Assignment.*—The plaintiff gave in evidence the proceedings of the board of property showing the rejection of the return of survey of the ten acre warrant, and the refusal to issue a warrant on the two hundred acre application. The learned judge, speaking of these proceedings, and of the point raised by the defendant which was refused, remarked that the decision of the board was competent evidence but was not conclusive. No effect upon any right of the plaintiff was given to the proceedings of the board by this remark. The full right of recovery was allowed, just as if those proceedings had not taken place. In the very next sentence the Court told the jury, that the plaintiff had a

[Horton *v.* The Chevington and Bunn Coal Company.]

right to bring suit within six months, and have his claim tried by a court and jury.

The proceedings having been given in evidence by the plaintiff himself, it was certainly not error for the Court to say that they were competent evidence though not conclusive.

*Second Assignment.*—This assignment is scarcely pressed and certainly has no merit. The judge merely stated an allegation that the shifting of the location in accordance with the plaintiff's theory would leave valuable land vacant, and subject to be taken up at a very low price. As this would be true in fact, we cannot say it was error.

*The Third, Fourth and Eighteenth Assignments.*—The statement by the judge of the law as to the duty of the surveyor to go upon the ground and mark his survey, and of the legal presumption that he had done this, was certainly correct. It is equally correct to say that no mere assumption, or guess of a surveyor is sufficient, to set aside the presumption. The remark was general and was harmless, if there were no assumptions or guesses in the plaintiff's testimony, but if there were, it was entirely appropriate. It was not in the best taste to refer to William Piper, the original surveyor, as having been a member of Congress and of the Pennsylvania Senate, since those positions would add nothing to his qualities as a surveyor, but it is surely not error to refer in speaking of a witness to the fact that he has held certain offices. The Court also said in the same sentence that Mr. Piper had also held, for several years, the office of deputy surveyor, which was more to the point. What was said by the judge as to the insufficiency of theories, assumptions, and guesses to destroy the effect of a survey and to prove mistakes in it, was entirely correct in the abstract. We cannot say there was no necessity for such remarks from the Court. It was undoubtedly true that an effort was made by the plaintiff to establish mistakes in the location of the Bunn warrant, by the use of certain theories and suppositions advanced by his surveyors. If these were not well founded, or if facts in the case sustained by testimony or legal presumption were in conflict with them, the remarks of the judge were appropriate and were demanded by the occasion. If the opinions, theories, or assumptions of the surveyors were well founded, their value depended upon the facts on which they were based, and it was proper for the Court to say so. The judge did not say that the plaintiff's testimony consisted of " suppositions, assumptions, and guesses," but that so much of it as was of that character, was insufficient to destroy the return of survey unless supported by facts.

It was the undoubted fact that Piper's return of survey to the Bunn warrant did call for the Bollman on the north, and by the same course and same distance as the southern line of the Bollman, and it was also the fact that Piper made both surveys and at very nearly the same time. This condition of these two surveys was absolutely fatal to the plaintiff's case, since his claim was for land lying between these two lines and required them to be a wide distance apart. Surely if such a location as was indicated by the returns of the Bollman and the Bunn was to be defeated by opinions and theories, whether in whole or in part, it was essential that those opinions and theories should be supported by facts, and by facts clearly established.

We think this is the fair construction of all that the Court said in this connection. What was said about the effect of surveyors' opinions generally must be taken as relating to the same subject matter, and not as a declaration that the opinion of a surveyor is of no value, even as to matters of opinion only, except when based upon facts actually proved to exist.

All this is true of the *Sixth Assignment*, which is of kindred character.

What was said about the number of witnesses, and the weight to be attached to or withheld from their testimony, is entirely correct. The remarks in question were not made about any particular part of the case. On the contrary they were general in their character and were in immediate connection with, and a part of, general suggestions to the jury respecting the importance and complicated character of the case, and the nature of the duties devolving upon them. These latter constitute the substance of the *Fifth Assignment* which certainly is without merit. The Court made no reflection upon counsel on either side. The remark in relation to counsel refers to those on both sides, and was in no degree derogatory to either.

Although the *Seventh Assignment* is pressed with earnestness we see no substantial merit in it. It consists of three sentences of the charge, the correctness of the first of which is not even questioned. In the second the Court used the word " dare," when perhaps " should " or " may " would have been more suitable, and alluded to the fact that some of the surveyors seemed to have assumed that Piper had neglected his duty or made mistakes. In the third sentence the judge said that Piper probably knew more about surveying than some of the witnesses who had ventured opinions. While this remark may have been entirely correct in fact, we think it was uncalled for and inappropriate. But that does not

[Horton *v.* The Chevington and Bunn Coal Company.]

make it error. It was at best the expression of a probability, the plaintiff's witnesses were not named or necessarily referred to, and the subject was not material. It cannot fairly be regarded as an attack upon the plaintiff's witnesses, as is contended in argument.

*Eighth and Ninth Assignments.*—The judge, in a considerable portion of the charge immediately preceding the parts complained of in these assignments, had pointed out certain material discrepancies between the survey of the Bunn, as located by the plaintiff, and the return of survey made by Piper. No exception is taken to this part of the charge, and an examination of the testimony proves it to be a correct presentation of the matters therein developed. This being so, it seems to us very material and appropriate for the judge to present the suggestions and inquiries contained in the portions assigned for error. We have not been able to discover any satisfactory answers to them, and the learned counsel for the plaintiff do not indicate any. We think they overestimate the language of the Court as being an attack upon their witnesses, or as being charged with feeling or heat.

*Tenth Assignment.*—The learned judge had just said that both sides claimed that the call for " surveyed land " on the west was filled by their respective locations, one by the Sipes and the other by the Chevington, and that the Chevington was considered a lost survey. Of course if the Chevington was an obscure or lost or uncertain survey, it would be natural that Piper, eleven years afterward in surveying the Bunn' should simply call for it as " surveyed land." The same would be true of the Sipes survey if it was of the same character, but there was no allegation that it was. On the contrary, it appears to have been a well-known survey without question as to its lines. The judge did not say there was any evidence that Piper had ever seen the draft of the Sipes survey or knew the survey by that name, but he did say that if Piper knew it and intended to adjoin it, he would naturally have named it as an adjoiner; and that it would be singular if he did not. This is all true, and the Court might well have completed the inferential process by adding that if the Sipes survey was unknown to Piper, he would in that event also have called for it as " surveyed land." It probably did not occur to the judge to present this additional hypothesis, simply because the well-known and well-marked character of the Sipes survey seems to have been taken for granted throughout the trial. Full fairness would have been subserved by the addition we have suggested, but we cannot say its omission was error.

[Horton *v.* The Chevington and Bunn Coal Company.]

*Eleventh Assignment.*—We think the learned counsel for the plaintiff have placed a more extreme construction upon the language of the charge here complained of than was intended by the Court, or than can be fairly inferred from the words used and the context. We do not understand the Court as saying that it was not possible, in any circumstances, to detach the Bollman from the Bunn, because both surveys called for the Lane improvement. The judge was evidently meeting and answering the argument, that the Bunn adjoined the Lane, because the Bunn survey called for the Lane, by the reply that the same reason would carry the Bollman also to the Lane, since that survey called for the Lane, on a mere continuation of the same line which on the Bunn survey called for it. A mere inspection of the two returns of survey proves this to be entirely correct, and we are quite clear that this is the true interpretation of the language of the charge. The question was what was Piper's meaning in calling for the Lane on the Bunn survey? If he certainly and absolutely meant that the Lane did adjoin the Bunn on the line N. 55 E., as indicated on the draft, then he did just as certainly and absolutely mean that the Lane also adjoined the Bollman on *its* line N. 55 E., as the latter was a mere continuation of the former. The next two succeeding sentences of the charge clearly prove this to have been the meaning of the judge, and these are not assigned for error. The language covered by the *Twelfth Assignment* demonstrates that the Court did not say or mean to say that the Bunn could not possibly be shifted without also shifting the Bollman, because that very question is there presented. Thus the learned judge says: "If then the call for the Bollman is the stronger and governing call, the next question is, is it controlled by definite and clearly marked lines on the ground which will carry the survey away from the Bollman and abut it on the Lane?" He then adds that if the jury cannot give the survey all its calls, and if the call for surveyed land on the west is better filled by the Chevington than the Sipes, "then there remains the question whether the plaintiff has found marks which must control the return of survey, govern the call, and draw this tract over to the Lane and away from the Bollman." There is not only no error in this, but it is conclusive proof that the portion of the charge covered by the eleventh assignment is not properly subject to the criticism made upon it.

*Thirteenth Assignment.*—The judge did not say that the chestnut block counted seventy-five growths, or give any direction to the jury that they should so regard it. On the contrary, he expressly told them that there was great con-

[Horton *v.* The Chevington and Bunn Coal Company.]

flict of testimony in regard to the blocks, and that they could take them and count them. He added that he had counted only one of them, and that he could count seventy-five growths on that one, and that there was no obscurity of growth in it. The block was a tangible, visible substance, and was itself given in evidence. Of course every juror was at liberty to count it, as were also all the counsel and the judge, each of whom could state the result of his own count. What the actual count was remained for the jury to determine. We cannot say the judge was in error when he said he could count seventy-five growths, as the block is not before us, and if he stated the fact correctly he certainly committed no error.

*Fourteenth Assignment.*—As the oral statement and arguments of counsel on the trial are not printed, and are no part of the record, it is of course impossible for us to say that the Court was in error in saying that it was insisted on either side that the block in dispute as to its genuineness, should be opened. We assume that in fact it was not opened, as no contrary allegation is now made.

*Fifteenth Assignment.*—The testimony quoted in support of this assignment does not convict the Court, in our judgment, of either suppression or perversion of evidence. None of it goes to 1806, or indicates that the improvement covered more than a quarter of an acre. As to its going beyond 1835, the assignment cuts in two the sentence of the charge on that subject, and alleges error in the first clause but not in the second. Now the second clause supplies what appears to be claimed as the error of the first, to wit, an implication that the evidence of this improvement does not go back of 1835. The part assigned as error is in these words : "The earliest evidence is in 1835." The remainder of the sentence which is not assigned says : "Then Long, who first saw it at that time, says it was an old-looking building, a story and one-half high, with a door in it, and used by a man named Snow, who was engaged in coaling," etc.

*Sixteenth and Twentieth Assignments.*—We cannot say there is error in the statement, "It is by no means sure that roads and streams are not quite as important as trees." . . . "They may be better." The relative value of these indications would depend largely upon their greater or less correspondence, in the given case, with their representations on the official survey. In the present case it must be confessed there is great difficulty in reconciling the road and stream appearing on the official survey of the Bunn, with the survey of the same tract as the plaintiff locates it. Again,

trees may not be always marked so as to speak with absolute
certainty, and there is often grave question as to the identity
of such as are claimed to have received the original marks.
Of course an interior stream is of less importance than a
boundary stream, but that consideration does not establish
error in the remarks covered by these assignments.

*Seventeenth Assignment.*—We think the concluding sen-
tence of the language here complained of might well have
been omitted    While the sentiment it contains may be a
legitimate deduction from the precedent reasoning, we think
it lacks the dispassionate calmness with which, as a general
rule, judicial utterance should be made.    The expression,
" quintessence of stupidity," might have been clad in choicer
phrase, but that is a matter of taste.    However these things
may be, the substance of this portion of the charge is within
the warrant of the testimony.    The judge was commenting
upon the feature of the case developed by the Lane improve-
ment.    This also was surveyed by William Piper in 1809,
three years after he surveyed the Bunn.    His return does
not call for the Bunn on the north but for Ray's Hill.    That
survey certainly does seem to interfere largely with the plain-
tiff's location of the Bunn.    The suggestion that it would
make three lines where one only would be necessary or prob-
able is of force, and we cannot say it was overestimated by
the Court.    The observations relative to the line of the
Moyer, N. 86 W., do not require comment.    It was mani-
festly and admittedly a mere error in writing the letter N.
for the letter S.

*Nineteenth Assignment.*—The judge did not say that the
old dead pine was a corner of the Bunn.    He simply said,
after stating that both the chestnut and the pine were dis-
puted, that the weight of the evidence was, if Ketterman
and Sams were believed, that the " pine is an old marked
corner."    As these witnesses did so testify we see no error
in the language of the charge.    We are not referred to any
testimony of the plaintiff's surveyors, and have not been
able to find any contradicting the pine as an old marked
corner.

We do not think the charge as a whole is answerable to
the objections of the *Twenty first Assignment.*    As to the
manner of the judge in delivering the charge, it is not and
cannot be, before us, and hence we cannot review it.    If it
were in truth of the character alleged, which is denied, it
would certainly be reprehensible, and deserving of condem-
nation by a court of error.    It is rarely that such complaints
are made, and there ought never to be an occasion for

[*In re* Cross Keys Tavern Road.]

them. We are, however, powerless to afford relief for griev-
ances of that kind, by the ordinary method of assignments
of error.

Judgment affirmed.